No. 42,403

PHOEBE HARRINGTON BROWNE, *Appellee,* v. FRANCINE LORIAUX and EVA LORIAUX, *Appellants.*

(866 P. 2d 1016)

Opinion filed December 9, 1961.

*David W. Wheeler,* of Marion, argued the cause, and *Edwin G. Wester-haus,* and *D. W. Wheeler,* both of Marion, were with him on the briefs for the appellants.

*Allan R. Browne,* of Kansas City, Missouri, and *Roger Morse,* of Marion, argued the cause and were on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, C. J.: This action grew out of a dispute between joint owners of two producing oil leases as to the right to control the operation. The dispute ripened into a request for relief by way of partition. The plaintiff (Phoebe Harrington Browne) prevailed in the district court and defendants (Francine and Eva Loriaux) have appealed.

The allegations of the pleadings, highly summarized, are as follows:

Plaintiff in the first count of her petition alleges that she is the owner of a two-thirds working interest in two mineral leases on the Southwest Quarter of Section 21, and the West one-half of the Southwest Quarter of Section 28, Township 17, Range 4, Marion County, Kansas, and the two defendants are each the owner of a one-sixth working interest. Plaintiff in operating the leases incurred certain expenses with the implied and actual consent of defendants but that defendants have refused to pay their proportionate share. Judgment is requested.

The second count of the petition contains specific allegations of interference with plaintiff's operations by defendants and requested the court to declare that plaintiff had the power to decide all disagreements and commit all interests in developing the leases. There was a further request that defendants be enjoined from stating to employees and others that plaintiff had no right to operate the leases and from hindering and preventing plaintiffs from developing the leases.

The third count of such pleading alleged that defendants had attempted to exclude plaintiff from the operation of the leases and from using the name Loriaux & Harrington Oil Company.

Plaintiff also filed an amended petition in which she realleged the disagreement between the parties as to the operation of the leases, interference on the part of the defendants and further prayed that if she not be declared operator of the leases that such leases be partitioned and sold and the proceeds divided according to the respective interest of the parties.

In their answer defendants admitted ownership of the leases as alleged in the petition; denied plaintiff's right to operate the leases or expend any sums whatsoever in connection therewith; denied that they in any way consented to any expenditures by plaintiff; and further denied that plaintiff had any proprietary right in the name of Loriaux & Harrington Oil Company or that she was entitled to a partition.

The defendants also cross-petitioned. In this pleading they alleged the history of the operation of the leases; asserted that they as the remaining members of the Loriaux & Harrington Oil Company were the operators of the leases; prayed that plaintiff be enjoined from interfering; and also prayed for judgment against plaintiff for sums expended by them in the operation of such leases.

Plaintiff replied denying generally the right of defendants to the relief requested in the cross-petition.

The defendants also filed an amendment to their answer in which they alleged that plaintiff had entered into a scheme with a deliberate intent to "squeeze out" defendants; that partition would work an undue and inequitable hardship on them with a great financial loss; and that in good conscience plaintiff's prayer for partition should be denied.

Following the trial of the issues the court announced that its decision was "for the plaintiff generally." It then rendered a judgment in which, according to the journal entry, it adjusted the accounts of the parties for expenditures made in connection with the operation of the leases; gave plaintiff judgment for the balance due; enjoined defendants from asserting they were the sole operators of the leases and that plaintiff did not have a two-thirds interest in the ownership and operation of the leases, property and trade name (Loriaux & Harrington Oil Company); decreed that plaintiff had power and authority to determine policies of operation; make decisions; take action in event of disagreements between interest holders; and hire and discharge employees. In addition the court further decreed that, "the interests of all parties in said leases, property and trade

name be appraised and sold in partition, in accordance with the statutory procedure, said interests not being susceptible of partition in kind without manifest injury to the interest holders. . . ."

The parties are more in disagreement as to the facts to which the law is to be applied than they are as to the principles of law applicable to a given set of facts. A detailed statement of the facts is therefore necessary.

In passing it should be noted that the trial court did not make findings of fact and none were requested, therefore, all questions of controverted fact must be resolved in favor of the court's decision. See, e. g., *In re Estate of Duncan,* 186 Kan. 427, 350 P. 2d 1112, where it is held:

"A general finding by a district court determines every controverted question of fact in support of which evidence was introduced and raises a presumption that it found all facts necessary to sustsain and support the judgment." (Syl. ¶ 1.)

And in the opinion said:

"In the instant case findings of fact and conclusions of law were not requested by either party nor made by the trial court upon its own initiative; hence, all questions must be resolved in favor of the trial court's decision, and it must be presumed that the court considered all necessary evidence to make the general findings and enter judgment thereon. It has been held that a general finding made by a trial court determines every controverted question of fact in support of which evidence has been introduced, and that a general finding by a trial court raises a presumption that it found all facts necessary to sustain and support the judgment. (*Dryden v. Rogers,* 181 Kan. 154, 157, 309 P. 2d 409; *Manville v. Gronniger,* 182 Kan. 572, 577, 322 P. 2d 789; *Redman v. Mutual Benefit Health & Accident Ass'n,* 183 Kan. 449, 457, 327 P. 2d 854.)" (pp. 433, 434.)

The only function of this court on review, in the absence of findings of fact, is to examine the record to ascertain whether the evidence establishes facts which support the judgment of the trial court. In view of the foregoing well-established rules of law, we will summarize the facts as disclosed by the evidence and which are implicit in the judgment of the trial court.

In 1939 John L. Harrington owned a one-half interest and three brothers Amour, Rodolphe, and Joseph Loriaux owned an undivided interest in the other one-half interest in the leases in controversy. The leases proved to be very productive and numerous wells were drilled thereon. On May 9, 1939, after the first well was drilled, the lease owners entered into an agreement which provided in part as follows:

"It is hereby understood and agreed that any expense incurred over and above $500.00, in equipping said well or wells and putting it on production, shall be submitted for approval to both first and second parties before incurred. It is further agreed that in case said well should be a producing oil or gas well, the parties hereto will enter into a further agreement for the operation of said well and said lease."

No further written operating agreement was ever entered into between the parties.

All four parties engaged in the operation of the leases. It does not appear that any of the parties interested in the leases, including the present litigants, ever received any compensation as a manager or operator. The bills were paid under the trade name of Loriaux & Harrington Oil Co. A bank account was established in the Union National Bank at Bartlesville, Oklahoma, for that purpose. The payments for the oil runs were made direct to the interest holders for their proportionate share. Each contributed their share of expenses to a common fund. Amour Loriaux kept the books, made the assessments and paid the bills until his death. It also appears that Rodolphe Loriaux was the field superintendent up until the time he sold his one-sixth interest to the plaintiff.

John L. Harrington died in 1943 and his one-half interest in the leases passed to his son, Tom Harrington. Tom died in 1945 and the one-half interest passed to his wife, now Phoebe Harrington Browne.

In 1953 Joseph Loriaux died and his one-sixth interest passed to his two daughters, the defendants. Amour Loriaux died in 1957 and his one-sixth interest was acquired by the defendants from Amour's executors in January 1958.

At all times until 1958 amicable relations existed among the interest holders. When there was a disagreement between the parties as to operations or expenditures the majority interests controlled. The plaintiff actively participated in the operation of the leases after the death of her husband Tom.

Beginning in 1958 a controversy arose as to the future location of the records, the right to operate the leases, incur expenses and other matters. The plaintiff discovered that the defendants were contending that she had no interest in the operation of the leases or in the trade name Loriaux & Harrington Oil Company. Plaintiff then informed defendants that she would pay her one-half of the bills direct to the creditors and started doing so March 1, 1959. Defendants refused to recognize the right of plaintiff and attempted to pay all

bills in full direct to the creditors. This caused the creditors to receive one and one-half times their actual billings.

Rodolphe Loriaux found himself in an untenable position. He was the only remaining member of the original adventure, holding only a one-sixth interest. His two nieces held a one-third interest and the daughter-in-law of one of his original partners held a one-half interest. He tried many times, without success, to get the ladies to sign a working agreement giving him "sole power to run the leases, to hire and fire the employees." He refused to agree to anything in connection with the operation of the leases in the absence of such authority. The proper operation of the leases was stymied.

On August 1, 1959, plaintiff attempted to break the stalemate by purchasing Rodolphe's one-sixth interest in the lease. The sum of $32,500 was paid for his interest. Plaintiff then wrote the defendants informing them of her acquisition of a two-thirds interest in the leases and requested their cooperation. Defendants answered —"This purchase does give you ⅔ interest in all of the lease properties; not the operations." Defendants refused to attend meetings arranged by plaintiff. Plaintiff continued the operation of the leases. She successfully fractured two wells and bought pipe for an offset well. The defendants refused to contribute to the expenses.

Plaintiff requested a meeting with the defendants at the leases on September 26, 1959. The defendants did not appear on that day or on the next day, although plaintiff was there on both dates. However, they appeared on the following day and demanded the bills from the pumper. When the pumper informed them that he had turned the bills over to the bookkeeper, plaintiff had appointed in Herington, he was informed by defendants that plaintiff had nothing to say about the operation of the leases. The defendants then became abusive, swore and left. The next day they returned and attempted to force the pumper to admit that they were the sole operators of the leases. When they received no satisfaction on that subject rocks were thrown at the pumper and abusive language was used by them.

Defendants informed numerous merchants furnishing supplies for the operation of the leases that they were the sole operators and that no bills were to be sent to plaintiff.

Defendants first contend that plaintiff on acquiring a majority interest in the mining partnership did not have the right to summarily oust the defendants who held a one-third interest and were oper-

ating managers of long standing by virtue of an implied operating contract. They further contend that the trial court erred in decreeing that plaintiff, holding the majority interest, had the power to determine policies of operation, make decisions, and take action in the event of disagreement between interest holders.

The facts do not support defendants' contentions. We find no evidence of an implied operating contract held by the Loriaux family, particularly one that would pass by inheritance. Up until 1959, a member of the Loriaux family did sign the checks by which the bills were paid but all other matters of operation were determined by mutual agreement. Later where the interests were equally divided on a question of operation nothing was done.

Treating the mining partnership as one entity and the operating partnership as another, as the parties have done, does not strengthen the position of the defendants, who quote from 40 C. J., Mines and Minerals, § 804(4), p. 1149 [58 C. J. S., Mines and Minerals, § 246 (e), p. 701.], as follows:

"The assignee of an interest in a mining partnership becomes a member of the partnership, and takes his interest subject to the conditions and terms under which his assignor held it without any express assumption thereof. . . .

We approve the foregoing statement as a general proposition of law, however, both the plaintiff and the defendants in this case acquired their interests in the same manner. The plaintiff acquired a one-half interest by inheritance and acquired a one-sixth interest by purchase from one of the Loriaux brothers. The defendants acquired a one-sixth interest by inheritance and purchased the one-sixth interest of one of the Loriaux brothers. The nature of the interests acquired and the method of acquiring them furnishes no basis for a distinction between the rights of the parties as to management. Neither does the method of acquiring the interests furnish any basis for defendants' contention that they were the sole owners of the trade name, Loriaux & Harrington Oil Company.

As between themselves, control of a mining partnership, rests with the members owning a majority of the shares. (2 Rowley on Partnership [2nd Ed.], § 56.9, p. 681; 4 Summers on Oil and Gas [Perm. Ed.], § 731, p. 167.)

A mining partnership has many things in common with a commercial partnership and to a great extent is governed by the same rules of law. There are, however, a few well defined exceptions. In a mining partnership there is no element of choice as to who are to

be partners. This is one of the essentials in creating a trading partnership. A sale or transfer of an interest in a mining partnership does not effect a dissolution as it does in an ordinary partnership. It is not necessary to effect the formation or the continued existence of a mining partnership that there be an express agreement to become partners. The existence of a mining partnership will be inferred where several owners unite to operate or work a mine or oil and gas lease. In the absence of an agreement to the contrary it is indispensable to the conducting of the business of oil and gas production that those owning the majority interest in the property have the power to control in case all cannot agree. A member of a mining partnership may sell or transfer his interest as he sees fit, even without the consent or knowledge of other members. A new member may be introduced into the partnership without the consent and even against the wishes of the other members. A mining partnership is not dissolved, as is an ordinary partnership, by the interest of a partner passing to another by sale or by death. For well-recognized legal treatises dealing with the divers subjects referred to in this paragraph see 58 C. J. S., Mines and Minerals, §§ 244 to 248, incl., pp. 685 to 704, incl.; 36 Am. Jur., Mines and Minerals, §§ 157 to 166, incl., pp. 391 to 396, incl.; Thornton, Oil and Gas, Cumulative Supplement, § 551, p. 131; 4 Summers on Oil and Gas §§ 724 to 734, incl., pp. 154 to 173, incl.

It is next contended that it was agreed that there would be no expense incurred over $500.00 in equipping wells or putting them on production unless the expense was first submitted to all parties for approval, hence the trial court committed error in allowing a personal judgment against defendants which included the costs of fracturing two wells and purchasing a string of pipe, each of such items exceeding a cost of $500.00.

The chief difficulty with this contention is the fact that plaintiff attempted to get the defendants to meet with her to discuss the items involving the expenditures but they avoided meeting with her. As she could not obtain their consent, she, as holder of a majority interest, had the right to incur such expenses as were beneficial and necessary to the proper operation of the leases. The fact that a real benefit resulted from the expenditures is not disputed.

The statement made in the case of *Stephens v. Allen*, 314 Ky. 769, 237 S. W. 2d 72, is appropriate here. It reads:

". . . Since the property can be used and operated only as an entirety, it is indispensable that those persons who own the major portions or

majority interests have the power to control the conduct of the business in the absence of agreement by all." (p. 772.)

See, also, 58 C. J. S., Mines and Minerals, § 246(a), p. 692; 36 Am. Jur., Mines and Minerals, § 162, p. 394.

The defendants also contend that, in view of the fact plaintiff requested she be decreed management control and if not that there be a decree of partition, the court erred in holding plaintiff had the right to control the management of the leases and at the same time decreed partition.

This claim is based on a misinterpretation of the trial court's judgment. The decree necessarily implies that on account of irreconcilable differences between the partners there was no prospect of future profitable operation. The court therefore decreed partition. The plaintiff's right to control management continued only until partition was effected. Plaintiff's control of management was in lieu of the appointment of a receiver, which was considered. The court properly concluded that there was no question of fraud, or threatened destruction of the property by leaving it under plaintiff's control pending partition. (*Browning v. Blair*, 169 Kan. 139, 218 P. 2d 233.)

Another contention, strenuously argued, is that the court erred in its order of partition. This contention is based more on a question of fact than a question of law. Defendants state in their brief:

". . . The conduct of the appellee (plaintiff) . . . clearly reflects that she intentionally created confusion and disrupted the management of the mining partnership which was operating profitably . . ."

The trial court did not agree with defendants' conclusion of fact, The facts heretofore stated refute their contention. In addition the plaintiff testified:

"A. . . . I have tried to get the Loriaux sisters to meet with me. I have written to them on numerous occasions and invited them to meet with me on three occasions, giving them at least two alternate dates in case the first one was not suitable to them. They never come nor informed me they could not come.

"Q. Within the last year have you personally invited them? Have you seen them in person?

"A. One evening about dusk I met them on the road to the leases, within about a mile of the leasehouse itself, and rolled down the car window and asked them to come on out and meet me on the lease. This, they did not do.

. . . . . . . . . . . . . . .

"Q. Then what effort had you made since that time, have you tried to operate with them?

"A. Well, I had hoped that before we came to lawsuit we could work out some method to operate these leases for the benefit and profit of all but I was not successful in having any agreement of any sort, wouldn't agree to anything, and even in the office of Mr. Wheeler we made some efforts to discuss the possibilities of hiring a management company. We had copies of management form agreements but the Loriaux sisters refused to consider them because in each form agreement was the statement in case of misunderstanding a majority ruled. Of course, I could not accept any agreement that would not make that provision.

"Q. What is your feeling now as to whether or not those leases can be operated even with a Court order without a partition?

"A. Well, I feel that even if I were able to operate the leases as the majority controlling interest, there would probably be an argument for every major expense and ensuing lawsuits on every occasion; because I have not been able to come to any agreement in the past, I have no reason to believe that there would be any more cooperation in the future."

In the face of the facts to which we have previously referred, the evidence just quoted, our decisions to be presently mentioned, and mindful that under the law of this state (see G. S. 1959 Supp., 60-2101 and 60-501) an estate or interest created by an oil, gas or mineral lease is subject to partition, we are convinced the defendants' position on the point now under consideration lacks merit and cannot be upheld.

*Strait v. Fuller,* 184 Kan. 120, 334 P. 2d 385, holds:

"After the amendment of G. S. 1949, 60-2101, by L. 1953, Ch. 276, § 6, the owner of an undivided interest in an oil and gas leasehold estate may file a sufficient petition for partition of the leasehold estate without alleging special reasons for the intervention of a court of equity." (Syl. ¶ 1.)

In *Hurley v. Painter,* 180 Kan. 552, 306 P. 2d 184, we held:

"In an action to partition real estate under G. S. 1949, 60-2101 to 60-2114, it is held that in administering the provisions of the pertinent sections of the code, the trial court has the same powers as were exercised by chancery courts under equity practice, including full power to settle all questions involved on just and equitable principles." (Syl. ¶ 5.)

And in *Johnson v. Burns,* 160 Kan. 104, 159 P. 2d 812, it is said:

". . . Ordinarily where there is as wide a discretion reposed in a trial court as is reposed in it in partition actions we are reluctant to interpose our judgment for that of the trial court. (See *State v. Foren,* 78 Kan. 654, 97 Pac. 791, also *Deeds v. Deeds,* 108 Kan. 770 [774], 196 Pac. 1101.)" (p. 111.)

In conclusion it should be stated we have not attempted to here answer all arguments advanced by zealous counsel for the parties in support of their respective positions on this appeal. Many of them have become immaterial and purely academic in view of the

conclusions heretofore announced and for that reason require no discussion. Others, not regarded as of sufficient importance to warrant space in the opinion, have been considered and rejected.

Therefore, since we find no error in the record which warrants or permits a reversal of the judgment it must be affirmed—and it is so ordered.