No. 45,053

CHARLES H. CASEBEER (Claimant), *Appellee* and *Cross-Appellant*, v. JOHN CASEBEER d/b/a CASEBEER OIL & GAS COMPANY (Respondent) and ALLIANCE MUTUAL CASUALTY COMPANY (Insurance Carrier), *Appellants*.

(433 P. 2d 399)

Opinion filed November 13, 1967.

*Evart Mills,* of McPherson, argued the cause, and *Michael T. Mills,* of McPherson, was with him on the briefs for the appellants, John Casebeer d/b/a Casebeer Oil & Gas Company and Alliance Mutual Casualty Company.

*Jack O. Bowker,* of McPherson, argued the cause, and was on the briefs for the appellee and cross-appellant.

The opinion of the court was delivered by

KAUL, J.: The claimant (appellee and cross-appellant) was awarded workmen's compensation in proceedings before the workmen's compensation director and in the district court. The respondent employer and his insurance carrier appeal. The claimant contends compensation was properly allowed except as to the amount in regard to which he has filed a cross-appeal.

The award of the workmen's compensation director was affirmed in all respects by the trial court except the date of the accident was correctly changed from April 4, 1965, to April 12, 1965.

The claimant, Charles H. Casebeer, and the employer, John Casebeer, are brothers. John is in the oil and gas business. He owns an interest in a number of leases and is also sole proprietor of Casebeer Oil & Gas Company, a business primarily concerned with operating and servicing oil and gas wells.

On January 29, 1962, the employer filed his election to come within the provisions of the Kansas Workmen's Compensation Act. In the election the employer is identified as J. W. Casebeer DBA Casebeer Oil Operations engaged in the business of oil production, drilling and oil field equipment.

The claimant worked for his brother (John) most of the time since 1939 or 1940. Approximately eighteen months prior to the accident, claimant was fired or laid off. He was later rehired and had been working for employer regularly for several months prior to the accident. He was hired by the month as a pumper and was paid $50 each for pumping four oil wells and $12 each for picking up meter charts on two gas wells, or a total of $224. In addition to his work as a pumper, claimant was frequently hired by the employer to do welding and miscellaneous labor on an hourly basis. The evidence discloses that claimant was paid five or six dollars an hour for welding and two dollars an hour for other labor. Claimant operated a welding business known as "Charley's Welding" and did welding and miscellaneous labor for other employers as well as the Casebeer Oil & Gas Company.

Claimant when working for employer as a pumper, welder or common laborer, was supervised by the employer or his superintendent, Allen Koehn. If claimant needed any helpers they were hired by the employer.

On Sunday, April 11, 1965, the day preceding the accident, the employer went to claimant's house and told him about an orbital valve at a junk yard. The employer testified that he told claimant to mark the valve so that his (employer's) boys could take a look at it; that he didn't want the valve destroyed until either he or his men could inspect it.

Claimant's version of the conversation was that employer told him to look at the valve and if he could buy it cheap enough to go ahead and buy it. Claimant testified that it was his understanding that he was to pick up the valve on his way to pump the wells the following morning. Claimant stopped at the junk yard the next morning, inspected the valve and loaded it in his pickup truck with

the help of another man. Claimant delivered the valve to the equipment yard of the employer.

An orbit or orbital valve is a safety valve used in drilling oil and gas wells and weighs about 270 pounds.

Claimant testified that he hurt his back while loading the valve. He continued with his work, however, and pumped the wells, did welding for two hours, worked on a compressor for two hours and graded a road for two hours on one of the leases his employer was servicing. Claimant had been employed a day or two in advance to do this work by the employer's superintendent, Allen Koehn. Claimant testified that during the day he got to the point where he could not get around. His condition continued to get worse every day. He contacted several doctors, including two psychiatrists who had previously treated claimant for a nervous condition and alcoholism. Claimant was referred by one of the psychiatrists to Dr. Charles Rombold, an orthopedic surgeon. Dr. Rombold diagnosed claimant's injury as "a *degenerated intervertebral disc at the lumbosacral level,* symptoms of which apparently had been aggravated by a strain four weeks previous to the time of the examination." (Emphasis supplied.) Dr. Rombold performed a spinal fusion on claimant on May 27, 1965.

Proceedings were had before the examiner on November 2, 1965, and January 4, 1966. The record was assembled disclosing the evidence for the claimant, consisting of his testimony, that of his wife, Dorothy Casebeer, and the junk yard operator, H. E. Copeland, and the depositions of Drs. Rombold and Harris. Respondent's evidence consisted of the testimony of John W. Casebeer and the deposition of Dr. John Morton.

Compensation was awarded by the examiner and on application of claimant the award was reviewed by the director.

The director found claimant's average weekly wage to be $143.69 based upon claimant's wage as a pumper in the amount of $53.69 a week, as a welder $60 per week and as a laborer $30 per week. Based on such findings the director awarded compensation for 22 weeks temporary total disability at the rate of $42 per week and 393 weeks of permanent partial disability at the rate of $12.93 per week based upon a 15% disability to the body as a whole. The director further ordered the payment of claimant's medical expense, the amount of which is not in dispute if claimant is entitled to compensation.

The trial court made no separate findings of its own but, as we have previously indicated, affirmed the director's award in all respects except as to the date of the accident.

On appeal the employer and insurance carrier contend the trial court erred: (1) In failing to find that employer and claimant were partners and that claimant could not collect workmen's compensation from a partnership of which he is a member; (2) in finding an employer and employee relationship existed between claimant and employer with reference to the orbital valve; and (3) in its computation of claimant's average weekly wage. It is further contended that there was no substantial evidence to support the award or any part thereof.

The claimant in his cross-appeal contends the trial court erred in computing the amount of compensation. Specifically, claimant contends the trial court erroneously omitted one item of four dollars for two hours of labor in grading a road on the day of the accident and further that partial disability of 25% rather than 15% should have been allowed.

Before discussing points raised on appeal we must again reiterate that on appellate review of a workmen's compensation case, this court does not weigh the evidence and it must be considered in the light most favorable to the prevailing party. We have so held in a long line of cases. Some of the most recent decisions are *Gray v. Beller,* 199 Kan. 284, 428 P. 2d 833; *Mooney v. Harrison,* 199 Kan. 162, 427 P. 2d 457; *Morgan v. Sholom Drilling Co.,* 199 Kan. 156, 427 P. 2d 448.

Respondent and insurance carrier contend that respondent and claimant were partners rather than employer-employee at the time of the accident. The argument is based on the premise that claimant owned a one-sixteenth interest in a gas line system consisting of two gas wells and a one-sixteenth interest in each of two oil wells in which respondent also owned an interest. Assuming that claimant's ownership of a one-sixteenth interest in the four wells establishes a mining partnership in such properties, an employer-employee relationship is not perforce prohibited.

The respondent testimony in regard to employing claimant is narrated as follows:

". . . I am in the oil and gas business. I operate with co-owners and have a mining partnership in different leases.

"Charles Casebeer used to work for me as my production superintendent.

welding business, Charley's Welding. I would give him work from time to time when I needed someone to do welding work. Charles asked me if I ever had a pumping job open he would like to try it. Just before Christmas Ed Sigley asked to be relieved and I told Charles he could try the work."

Claimant's testimony in part as narrated reads:

"I have no interest in Casebeer Oil & Gas Company. I do have an interest in some of the oil wells that are serviced by Casebeer Oil & Gas Company.

"I don't know how John Casebeer works his books. I put down my time and my hours. What he charges the people who have working interests in the oil wells would be up to him.

"I was paid wages as a pumper by the month by Casebeer Oil & Gas Company. I got $50.00 per well per month and I had to pick up charts on two gas meters. I got $12.00 a month for each one of them. On the average it would take me probably three hours a day to perform these services if they were running good. It is hard to tell. Some days it would take longer. Some days you didn't get done."

". . . From January 1 until in April I was operating my welding business and working for John and for anybody else that wanted to hire me, if I could get work."

"Any time I performed additional work either John Casebeer or Allen Koehn would tell me to do such work. . . ."

There is evidence that respondent, doing business as the Casebeer Oil & Gas Company, operated and serviced the leases in question rather than as a member of the several mining partnerships arising from the ownership of the leases. Regardless of the viewpoint taken the trial court has resolved the question in favor of the workman even though no specific finding was made on the point. We take note from exhibits in the record that John is the owner of a majority interest in the four leases in which Charles had an interest. As owner of a majority interest in the four leases in question John was vested with authority to control the conduct of the business in the absence of an agreement by all owners. (*Browne v. Loriaux*, 189 Kan. 56, 366 P. 2d 1016.) It follows that John, as a majority owner, had authority to hire and fire workmen. Claimant could not be said to be a self-employed person merely because of his minority membership in the mining partnership.

Respondent and his carrier also argue that there was no contract of employment as to claimant's work as a welder and laborer.

In determining the actual relationship of parties under the Workmen's Compensation Act courts do not regard a single fact as conclusive but will look at all the facts and circumstances involved in

a particular case. Our Workmen's Compensation Act does not require an express contract to establish its existence, the conduct of the parties being sufficient to disclose an agreement. (*Durnil v. Grant*, 187 Kan. 327, 356 P. 2d 872; *Bright v. Bragg*, 175 Kan. 404, 264 P. 2d 494.)

In view of what has been said we find no reason to disturb the ruling of the trial court with respect to the relationship of the parties or the contract of employment.

We turn next to the question whether or not claimant's injury arose out of and in the course of his employment. Claimant was on his way to work when he loaded the valve into his truck. It appears that after loading the valve he next proceeded to his pumping duties and then went on to his welding, road grading, and worked on a compressor for which he had previously been engaged. There is some conflict between the testimony of respondent and that of claimant as to what specifically were the orders in regard to picking up the valve. Without delving into the evidence further on this point, it will suffice to point out again that this court does not concern itself with conflicting evidence in workmen's compensation cases. It is argued that here the workman was on his way to work when he suffered the injury and that under the provisions of K. S. A. 44-508 (*k*), (now K. S. A. 1965 Supp. 44-508 [*k*]) as construed and applied in *Chapman v. Victory Sand & Stone Co.*, 197 Kan. 377, 416 P. 2d 754, compensation is precluded. The simple answer to this argument is that in the case before us the workman was not on his way to work but was already performing a part of his employment when he stopped at the junk yard at the direction of his employer when the accident occurred. The act does not require that the injury was sustained on or about the employer's premises. (*Blair v. Shaw*, 171 Kan. 524, 233 P. 2d 731.) In the case at hand, considering the evidence in the light most favorable to the prevailing party, as we are required to do, it appears that claimant was doing something connected with the employer's business, under the direction of the employer, for the benefit of the employer and at a place where the work was to be performed at the time the accident occurred. Injuries resulting from an accident under such circumstances are compensable. (*Taylor v. Centex Construction Co.*, 191 Kan. 130, 379 P. 2d 217; *Pinkston v. Rice Motor Co.*, 180 Kan. 295, 303 P. 2d 197; *Bell v. Allison Drilling Co.*, 175 Kan. 441, 264 P. 2d 1069; 1 Larson on Workmen's Compensation Law §27.40, pp. 452.60 to 452.69, incl. [1952].)

There is substantial competent evidence to support the trial court's conclusion that claimant was in the course of his employment at the time he injured his back in loading the orbital valve.

This brings us to the question concerning the computation of compensation. As previously indicated, both parties have appealed in this respect. We shall consider first the position of claimant. It is contended the trial court should have awarded compensation on a basis of a minumum of 25% permanent partial disability rather than 15% allowed. Medical evidence in the record consists of the testimony of Dr. Rombold, the orthopedic surgeon who performed the spinal fusion, and that of Drs. Harris and Morton, psychiatrists. Dr. Rombold testified that he would allow 10% permanent partial disability as a result of the spinal fusion. Dr. Harris testified that claimant would have a 15% to 20% permanent partial disability as a result of the aggravation of pre-existing nervous condition caused by pain of the back injury.

Dr. Morton's testimony on direct examination is narrated as follows:

"I am a psychiatrist at Hertzler Clinic, Halstead, I first saw Charles Casebeer in 1961 for alcoholism. I saw him again later in the month and again in January of 1962. I did not see him again till December 22, 1965. My interview and examination disclosed that he had improved considerably in his physical appearance and health and he was not showing any evidence of alcoholism. He stated he had not had a drink in six months, this being the period in which he had ceased to work for his brother and had taken other employment. He stated he had never felt better in his life and that in his opinion his brother did too and they were both the better off for it. I was unable to find any evidence of nervous disorder."

On cross-examination Dr. Morton testified in substance that he would have no reason to disagree with the permanent partial disability of 15% to 20% rating by Dr. Harris.

Claimant contends that 15% to 20% permanent partial disability suggested by the testimony of Drs. Harris and Morton should be added to the 10% allowed by Dr. Rombold, resulting in a minimum rating of a 25% permanent partial disability. Apparently the trial court, in weighing the medical evidence, added 5% from the testimony of Drs. Harris and Morton to the 10% allowance of Dr. Rombold in arriving at an allowance of 15% permanent partial disability. This the trial court was entitled to do. After noting the rules of appellate review, hereinbefore set out, we stated in *Elliott v. Ralph Construction Co.,* 195 Kan. 723, 408 P. 2d 584:

"Under the foregoing rules the trial court was entitled to believe the testimony of Dr. Hall, who was the claimant's examining physician and family doctor of long standing, and disregard the testimony of Dr. Spitzer. The record therefore contains substantial competent evidence to uphold the trial court's finding. . . ." (p. 726.)

In this case the trial court's finding of 15% permanent partial disability was within the scope of, and supported by, the evidence and therefore will not be disturbed.

We shall consider next the serious issue raised in connection with the computation of compensation. The problem arises in connection with the determination of claimant's average weekly wage.

The trial court found the average weekly wage to be $143.69. The calculation used to arrive at this figure appears to be the addition of $53.69 weekly wage as a pumper, $60 per week as a welder, and $30 a week as a laborer to arrive at a total of $143.69.

It is conceded that the figure of $53.69 was reached by a mathematical error, the correct amount being $52.29.

It appears the trial court computed claimant's weekly wage as a welder by multiplying by five the twelve dollars received by claimant for welding on the day of the injury and likewise computed weekly wages as a laborer by multiplying by five the six dollars received for work on a compressor. Claimant contends the trial court erroneously omitted in its calculation four dollars paid claimant for two hours labor in grading a road.

Respondent and his carrier claim that if claimant is entitled to compensation it should be based on only his weekly wage as a pumper. It is argued that earnings of claimant as a welder and laborer should not have been used in computing claimant's weekly wage because those earnings were for work done after the injury rather than prior thereto. Respondent and carrier reach into the language of K. S. A. 44-510 (3) (c) (24) to support their position. The provision relied upon directs that compensation for a period of temporary or permanent partial disability not exceeding 415 weeks be 60% of the difference between the amount employee was earning *prior* to his injury and the amount he is able to earn after his injury. There is no merit in this contention. Even though the wages used by the trial court in its calculation were earned after the injury there is substantial competent evidence in both testimonial and documentary form that claimant had been employed both as a welder and laborer by this employer on numerous occasions for several

months prior to the injury. In fact, claimant was employed a day or two before the injury to do the work performed on April 12, 1965. Furthermore, in view of our conclusion as to computation the matter is irrelevant.

We find error, as a matter of law, in the method used by the trial court in computing claimant's average weekly wage as a welder and laborer. K. S. A. 44-511 defines the method of calculating a workman's average weekly wage. The import of the statute is set out and its inapplicability as to the determination of the average weekly wage of a part-time worker, paid by the hour, where there is no customary number of working hours constituting an ordinary day, is explained in detail in the recent case of *Armstrong v. Manpower, Inc.*, 194 Kan. 753, 401 P. 2d 903. As we stated in *Armstrong*, the simple formula prescribed in the statute will not work unless it can first be determined how many hours customarily constitute an ordinary working day.

The *Armstrong* case dealt with a workman similarly situated as claimant in the case at hand. Armstrong was a part-time employee hired on an hourly basis when work was available. When he worked he might work from one to as many as eight hours a day. The failure of the statute to prescribe a formula in such a case was pointed out in *Armstrong* where we said:

"Our attention has been directed to no statutory formula for computing the average weekly earnings of an injured workman, other than that set out in G. S. 1961 Supp., 44-511, nor has our own research revealed any other legislative pronouncement. Hence, we are without legislative direction as to the manner in which this claimant's weekly wage should be figured even though we may be sure that the legislature never intended a workman in plaintiff's position to be without remedy." (p. 755.)

We reached the following conclusion in *Armstrong:*

"We conclude, for reasons heretofore stated, that the provisions of G. S. 1961 Supp., 44-511, defining the formula for computing the average weekly wage of a workman who is paid by the hour, are not applicable to a workman in this claimant's position. We further conclude that in the absence of legislation applicable to the facts disclosed in this case, the average weekly wage of a wage earner, such as plaintiff, is to be computed on the basis of his actual average weekly earnings." (p. 757.)

We believe the direction clearly stated in *Armstrong* should be applied here in ascertaining claimant's average weekly wages for welding and labor. That is to say, the average weekly wages of claimant should be determined by ascertaining his average actual weekly earnings as a laborer and welder.

This court has often reiterated that the jurisdiction of the trial court in compensation cases is simply to grant or refuse compensation or to increase or diminish any award and does not include the power to grant a trial *de novo* nor to hear new evidence and must take the case on the transcript of proceedings previously compiled. (*Attebery v. Griffin Construction Co.*, 181 Kan. 450, 312 P. 2d 598; *Place v. Falcon Seaboard Drilling Co.*, 186 Kan. 523, 350 P. 2d 788; *Fleming v. National Cash Register Co.*, 188 Kan. 571, 363 P. 2d 432; *Landes v. Smith*, 189 Kan. 229, 368 P. 2d 302.) It follows the average actual weekly earnings of claimant must be ascertained from the record.

The testimony of both parties established that claimant was employed on January 1, 1965, and worked for respondent through April 12, 1965, regularly as a pumper and frequently on an hourly basis as a welder and laborer. This amounted to a period of fourteen calendar weeks during which time claimant was paid a total of $238.00, for his extra work as a welder and laborer, as reflected in the assessment statements of the employer. The statements referred to were admitted as exhibits and appear to be the only evidence in the record as to the actual earnings of claimant paid by this employer during the period in question. It follows the actual average weekly earnings of claimant as welder and laborer during this period amounted to $17 per week plus his actual weekly earnings of $52.29 as a pumper totals $69.29.

The judgment of the trial court is affirmed as modified with directions to the trial court to enter judgment for compensation due claimant on the basis of an average weekly wage of $69.29.

It is so ordered.

SCHROEDER, J., not participating.