(84 P.3d 626)
No. 89,949

Larson Operating Company, A Division of Larson Engineering, Inc., As An Owner and As Representative of Other Working Interest Owners, *Appellee/Cross-appellee*, v. Petroleum, Inc., *Appellant*, and American Warrior, Inc., *Appellee/Cross-appellant*.

Opinion filed February 20, 2004.

*Robert J. O'Connor* and *David E. Bengtson*, of Stinson Morrison Hecker LLP, of Wichita, for appellant.

*Timothy E. McKee* and *Rachael K. Pirner*, of Triplett, Woolf & Garretson, LLP, of Wichita, for appellee/cross-appellee.

*Robert T. Cornwell*, of Wichita, for appellee/cross-appellant.

Before GREENE, P.J., ELLIOTT, J., and KNUDSON, S.J.

GREENE, J.: This appeal frames numerous issues among three parties (buyer, seller, and operator on behalf of those with preferential rights) after oil and gas leasehold interests that were purportedly subject to preferential rights to purchase were sold in

breach of such rights. The district court concluded that the buyer was a bona fide purchaser entitled to dismissal from the suit and then awarded judgment for damages against seller to those with preferential rights. On this issue we reverse, concluding that the buyer was not a bona fide purchaser. We affirm the district court on issues of the operator's standing to sue, the enforceability of the preferential rights provision, and the award of discovery sanctions.

## Factual and Procedural Overview

Petroleum, Inc. (PetInc) owned a 25% working interest in the Merrill 1-8 and 2-8 gas units in Finney County. The units were operated by Larson Operating Company (Larson), which owned no interest in either unit. The operating agreement included the following provision regarding preferential rights to purchase among working interest owners:

"Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to it interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock."

In offering its working interests for sale at auction, PetInc completed a "Property Information Form" for each interest offered by marking in the affirmative the inquiry, "Is the Property subject to any preferential rights?" PetInc then completed the "detailed ex-

planation" portion of the form for the Merrill 2-8 interest by including the following:

"Pref right to purchase under JOA dtd. 5-1-94, 'however, there shall be no preferential right by sale of all or substantially all of its oil and gas assets—Note: same for Merrill 1-8-.' "

The "detailed explanation" portion of the form for the Merrill 1-8 interest stated: "Pref right to purchase under J.O.A. dtd. 5-1-94".

On June 7, 2000, PetInc sold its Merrill interests to American Warrior, Inc. (AmWar) through an internet auction for $28,500. Notice of this sale was not given to the other working interest owners pursuant to the terms of the preferential right to purchase provision of the operating agreement. On June 26, 2000, PetInc executed an assignment of its working interests to AmWar, and the instrument of assignment included the following warranty language:

"Assignor herein agrees to bind itself, its successors, legal representatives and assigns, to warrant and forever defend all and singular the interest conveyed herein against every person whomsoever claiming by, through or under Assignor but not otherwise."

A few months following the sale, Larson apparently contacted PetInc regarding seismic work on the property, and PetInc advised Larson of the sale to AmWar. As a result of this contact, PetInc apparently realized the import of the preferential rights provision and made demand upon AmWar for return of the interests sold. AmWar refused the demand.

Upon AmWar's refusal to reconvey the interests, Larson gained consent of nearly all remaining working interest owners in the units to pursue legal action to enforce their preferential rights. Larson then sued PetInc for violation of the provision, and PetInc answered admitting that it breached the preferential rights provision of the operating agreement but stating that the breach was unintentional. PetInc also filed a third-party petition against AmWar seeking rescission. Larson later amended its petition to join AmWar and to seek specific performance.

On April 25, 2001, in responses to Larson's requests for admissions, PetInc admitted that the preferential rights provision was

valid and enforceable, that it was "triggered" by the assignment to AmWar, and that it failed to give the requisite notice to other interest owners. On June 26, 2001, PetInc moved the court for leave to amend its responses on grounds that the sale of the Merrill interests was part of PetInc's comprehensive plan to dispose of all its oil and gas assets, thus serving as an exception to the preferential rights provision. The court granted PetInc leave to amend its responses, but the court found that with minimal diligence PetInc could have responded more accurately and awarded Larson sanctions against PetInc in the amount of $10,000.

Larson then filed a motion for summary judgment, arguing that the preferential rights provision was enforceable and that the exception did not apply. PetInc opposed the motion, but the district court ultimately found that PetInc's sale did not fall within the exception to the preferential rights provision and granted summary judgment to Larson. This judgment has not been appealed.

The district court conducted a bench trial on October 9-10, 2002, and found that based upon the disclosure language contained in the Property Information Form and the testimony of an AmWar witness, AmWar was a bona fide purchaser and should be dismissed from the litigation. The court then awarded damages to Larson against PetInc in the amount of $207,422, less the purchase price of $28,500.

PetInc appeals, arguing AmWar was not a bona fide purchaser of the interests. In the alternative, PetInc disputes the district court's calculation of the damages awarded to Larson. PetInc also challenges the district court's assessment of sanctions against it for changing responses to Larson's request for admissions. Larson cross-appeals, also claiming the district court erred when it determined AmWar was a bona fide purchaser and when it failed to order rescission and specific performance. AmWar also cross-appeals, arguing that Larson is not a real party in interest.

*Is Larson a Real Party in Interest with Standing to Pursue Preferential Rights Claims of the Other Interest Owners?*

K.S.A. 60-217(a) provides:

"(a) *Real party in interest.* Every action shall be prosecuted in the name of the real party in interest; but an executor, administrator, guardian, conservator, trustee of an express trust, receiver, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in the party's own name without joining the party for whose benefit the action is brought. . . . *No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.*" (Emphasis added.)

"The real party in interest is the person who possesses the right sought to be enforced, and is not necessarily the person who ultimately benefits from the recovery." *Thompson v. James,* 3 Kan. App. 2d 499, 502, 597 P.2d 259, *rev. denied* 226 Kan. 793 (1979). The purpose of the real party in interest rule is principally to protect a

"defendant from being repeatedly harassed by a multiplicity of suits for the same cause of action so that if a judgment be obtained it is a full, final and conclusive adjudication of the rights in controversy that may be pleaded in bar to any further suit instituted by any other party." *Torkelson v. Bank of Horton,* 208 Kan. 267, 270, 491 P.2d 954 (1971).

Larson brought the action on behalf of the interest owners after procuring from most of the interest owners signed written consent forms, which stated: "The undersigned hereby authorizes Larson Operating Company to proceed on his behalf to exercise the preferential right to purchase as provided for in the Operating Agreement dated May 1, 1994." This written consent was later ratified by written ballot, wherein interest owners had the opportunity to mark: "YES—I approve of the decision to proceed with legal action to secure the 25% working interest improperly assigned to American Warrior, Inc."

The district court found that the action was authorized by express language in the operating agreement, which stated:

"D. Defaults and Remedies: *If any party fails to discharge* any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C or *any other provision of this agreement,* withing the period required for such payment hereunder, then in addition

to the remedies provided in Article VII.B or elsewhere in this agreement the remedies specified below shall be applicable.

. . . .

"2. <u>Suit for Damages</u>: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at join account expense) to collect the amounts in default . . . ." (Emphasis added.)

AmWar argues that this provision should be construed as being limited to "financial obligations" and was not contemplated to authorize suits to enforce property rights. AmWar also suggests that contract authorization cannot circumvent K.S.A. 60-217(a) and that there is no authority for the proposition that an operator can pursue property rights, as contrasted with operating rights, on behalf of working interest owners.

Operating agreements are quite common in the oil and gas business and can be indispensable to the conduct of such business when there is more than one working interest owner. See *Browne v. Loriaux*, 189 Kan. 56, 63, 366 P.2d 1016 (1961). The operating agreement is designed to coordinate development of the property by designating an "operator" and by specifying each working interest owner's rights and obligations. Such agreements generally address the authority of the operator to act on behalf of the nonoperators. 2 Pierce, Kansas Oil & Gas Handbook, § 17.17 (1989). Moreover, Kansas statutes impose a multitude of duties on the "operator," presumably because it would be inconvenient, unduly expensive, or perhaps completely ineffective to impose such duties on each interest owner. See, *e.g.*, K.S.A. 79-332a (obligating operator to file statement of assessment for purposes of ad valorem taxation); K.S.A. 55-151 to K.S.A. 55-157 (making operator responsible and obligating operator for a host of operational requirements); K.S.A. 2003 Supp. 55-165 (authorizing KCC to maintain database of all wells including identity of operator); K.S.A. 79-4216 (defining operator as responsible for management and operation of production); K.S.A. 79-4220 (permitting operator to remit severance tax). We cite such practice and statutory authority as supportive of our conclusion that a suit by an operator to enforce preferential rights created by the operating agreement does not

offend the language or the policy behind the real party in interest statute.

We conclude that the operator was a real party in interest because: (i) the preferential rights, although in the nature of property rights, were created by the operating agreement and were not unrelated to operational benefits; (ii) the express language of the agreement, although ambiguous as to precise extent, generally supports authority in the operator for suits to enforce defaults in its provisions; and (iii) the written consent forms signed by interest owners serve as "ratification of commencement of the action" so as to satisfy the statutory language. See K.S.A. 60-217(a). Additionally, we note that contract actions are assignable (*Bolz v. State Farm Mutual Automobile Ins. Co.*, 274 Kan. 420, 423, 52 P.3d 898 [2002]) and that the express written consent of the interest owners and the specific authorization of the operator to sue do not offend the policy underpinning of the real party in interest statute. See *Torkelson*, 208 Kan. at 270. We do not share AmWar's concern that it has no protection from a multiplicity of actions, since the express language of the preferential rights provision serves as a waiver of such rights as to all nonconsenting interest owners. We affirm the district court's conclusion that Larson was the real party in interest under these circumstances.

*Was AmWar a Bona Fide Purchaser Entitled to Dismissal From the Litigation?*

AmWar contends that since the district court expressly relied on oral testimony in determining reasonable reliance by a "prudent and diligent buyer," our standard of review is whether the district court findings are supported by substantial competent evidence and sufficient to support the trial court's conclusions of law. PetInc contends that our standard of review is de novo, citing *Miller v. Alexander*, 13 Kan. App. 2d 543, 547, 775 P.2d 198, *rev. denied* 245 Kan. 785 (1989). We embrace the de novo standard as appropriate, since the determinative issue is whether the Property Information Form provided actual or constructive notice, and this question is one of law. See *Miller*, 13 Kan. App. 2d at 547. For reasons addressed below, the actual "reasonable reliance" by the

subject buyer as well as its specific prudence and diligence in the transaction are immaterial in determining whether AmWar took with notice of the cloud on its title; we must determine whether the written instruments imparted actual or constructive notice of the preferential rights.

At the outset we note that the issue framed is unusual in that there is no dispute regarding the notice given: the Property Information Form provided *actual* notice that the interests were subject to preferential rights. The issue is whether the actual notice was nullified by the additional information provided: " 'however, there shall be no preferential right by sale of all or substantially all of its oil and gas assets——.' " Although AmWar suggested in oral argument that the use of the term "however" implied such nullification, we note that "however" appears to be directly quoted from the language of the operating agreement. We conclude that the disclosure form constituted actual notice of the preferential rights and merely quoted without opinion one of the exceptions contained in the agreement's operative language; moreover, if PetInc intended the form to reflect applicability of the exception, we presume that it could have simply marked "NO" to the inquiry regarding whether the interests were subject to preferential rights. We decline the parties' invitation to discuss and apply authorities on *constructive* or *implied* notice; such authorities have no application where *actual* notice is given.

Charged with actual notice that the interests were subject to preferential rights, together with a quoted exception to such rights, AmWar simply cannot deny that it purchased the interests with a possible cloud on the title. As stated by the court in *Miller*, "[i]f a *possible* cloud on the seller's title appears, the prospective purchaser must either clear the cloud or proceed at his own risk." (Emphasis added.) *Miller*, 13 Kan. App. 2d at 550; see *Schwalm v. Deanhardt*, 21 Kan. App. 2d 667, 906 P.2d 167 (1995).

AmWar argues that, based on constructive notice cases, the disclosures merely put it on notice of those facts which a reasonable diligent investigation would have ascertained. See *City of Arkansas City v. Anderson*, 15 Kan. App. 2d 174, 181, 804 P.2d 1026 (1991). AmWar then suggests that review of the operating agreement, con-

sultation with PetInc, and inquiry of Larson would not have led to any additional material facts regarding a cloud on the title. Although an intriguing argument, we decline to apply such constructive notice rules in an *actual* notice case. Perhaps more important, we decline to clothe AmWar with bona fide purchaser status based upon such speculation; the extent to which the parties have vigorously litigated the applicability of the preferential rights provision and the quoted exception belies any real probability that *diligent* investigation would not have demonstrated a substantial difference of opinion regarding the title issue. Finally, it was never disputed that AmWar made absolutely no inquiries whatsoever; even if it believed that the language of the disclosure form served to nullify any notice of the prior rights, we hold that at least some modicum of investigation was required of a bona fide purchaser under these circumstances.

The district court erred in finding AmWar a bona fide purchaser of the interests and in dismissing it from the litigation.

*Is the Preferential Rights Provision Unenforceable as Violative of the Rule Against Perpetuities?*

AmWar and PetInc next argue that the preferential rights provision in the operating agreement violates the rule against perpetuities and cannot be enforced by Larson on behalf of working interest owners. Larson argues that under the Uniform Statutory Rule Against Perpetuities, K.S.A. 59-3401 *et seq.*, the preferential rights provision was not invalid. PetInc responds by arguing that K.S.A. 59-3401 *et seq.* is unconstitutional.

In Kansas, the rule against perpetuities has been codified in the Uniform Statutory Rule Against Perpetuities, K.S.A. 59-3401 *et seq.* (the Act), which supersedes the common-law rule against perpetuities. K.S.A. 59-3408; *Gore v. Beren*, 254 Kan. 418, 429, 867 P.2d 330 (1994). The uniform act exempts nonvested property interests created by commercial nondonative transfers. The Act provides in part:

"K.S.A. 59-3401, statutory rule against perpetuities, does not apply to: (1) A nonvested property interest or a power of appointment arising out of a nondonative transfer . . . ." K.S.A. 59-3404.

Here, the preferential rights provision in the operating agreement creates nonvested property interests but does so in the context of a commercial, nondonative agreement that fits squarely within the statutory exemption. As noted by the official uniform comment to this section, the rationale for this exemption is that the rule against perpetuities is a wholly inappropriate instrument of social policy to use as a control over commercial and governmental transactions. 8B Uniform Laws Annotated, p. 280 (2001). Other courts have held that the rule against perpetuities was inappropriate for commercial transactions. See, *e.g., Shaver v. Clanton,* 26 Cal. App. 4th 568, 31 Cal. Rptr. 2d 595 (1994). Clearly, the statutory rule against perpetuities simply does not apply.

This statutory salvation is not determinative of the issue, however, since PetInc argues that the statute is unconstitutional because it was enacted by a bill containing more than one subject, in violation of Kan. Const. art. 2, § 16, which states:

"No bill shall contain more than one subject, except appropriation bills and bills for revision or codification of statutes. The subject of each bill shall be expressed in its title. No law shall be revived or amended, unless the new act contain the entire act revived or the section or sections amended, and the section or sections so amended shall be repealed. The provisions of this section shall be liberally construed to effectuate the acts of the legislature."

The Act was enacted as a part of L. 1992, ch. 302, which concerned the following subject:

"AN ACT concerning uniform laws; relating to the uniform commercial code; enacting the uniform statutory rule against perpetuities; enacting the uniform conservation easement act; amending K.S.A. 84-2-402 and K.S.A. 1991 Supp. 84-1-105 and repealing the existing sections . . . ."

The constitutional provision should be construed in light of the evils designed to be suppressed. *Laird & Company v. Cheney,* 196 Kan. 675, 687, 414 P.2d 18 (1966). Our Supreme Court has held that the subject constitutional provision intends the "prevention of a matter of legislative merit from being tied to an unworthy matter." *Garten Enterprises, Inc. v. City of Kansas City,* 219 Kan. 620, 622, 549 P.2d 864 (1976); see *State ex. rel. Stephan v. Thiessen,* 228 Kan. 136, 141, 612 P.2d 172 (1980) (quoting message from governor critical of session law because it combined two subjects,

"one strongly supported and one strongly opposed, in an effort to force through by rider a proposal which had difficulty in passage on its own merits"). To constitute plurality of subject matter in violation of the constitution, an act must embrace two or more dissimilar and discordant subjects that by no fair intendment can be considered as having any legitimate connection with or relation to each other. *State v. Reves*, 233 Kan. 972, 978, 666 P.2d 1190 (1983).

Here the subject matter of the enactment did not embrace "dissimilar and discordant subjects" but rather embraced a singular purpose: amendment and enactment of certain uniform acts in an attempt to harmonize them with Kansas legislative intent. Joinder of these enactments and amendments of uniform laws in a singular enactment did not offend the constitution, since there was no obvious intent to tie a matter of legislative merit to an unworthy matter. We decline to hold K.S.A. 59-3401 *et seq.* unconstitutional and conclude that the preferential rights provision at issue does not violate the rule against perpetuities as reflected in the statute.

*Did the District Court Err in Granting Discovery Sanctions Against PetInc in Favor of Larson?*

The award of sanctions, including attorney fees, for discovery violations is within the discretion of the trial court. *New Dimensions Products, Inc. v. Flambeau Corp,* 17 Kan. App. 2d 852, 860, 844 P.2d 768 (1993). An abuse of discretion arises only if no reasonable person would have taken the same position as the district court. *Hochman v. American Family Ins. Co.*, 9 Kan. App. 2d 151, 155, 673 P.2d 1200 (1984).

The Kansas Supreme Court in *Wilson v. American Fidelity Ins. Co.,* 229 Kan. 416, 421, 625 P.2d 1117 (1981), discussed the inherent powers of sanction in the discovery context despite the inapplicability of a specific authorizing statute:

"K.S.A. 60-237 provides for the imposition of statutory sanctions when a party fails or refuses to comply with an order entered by a court in a pending action. This is not our present case. The violations of the statute in the present case occurred prior to the filing of any action. There was no failure or refusal to comply with an order of the court. However, a court has certain inherent powers it may exercise, those reasonably necessary for the administration of justice, provided

these powers in no way contravene or are inconsistent with substantive statutory law. [Citations omitted.] Such inherent powers may be exercised as a means of enforcing obedience to a law which the court is called on to administer."

PetInc's reversal in position and need to amend its responses to Larson's request for admissions is but one of many vacillations by PetInc in this litigation. At the outset, it marked the disclosure form indicating that the interests were subject to preferential rights, but it conveyed the interests with special warranty of title. Incongruous with its warranty, it initially made demand for a return of the interests and conceded that the preferential rights provision had been violated. It next changed course and argued that the exception to the provision applied, but when it lost this argument on summary judgment, it reverted to the position that AmWar was not a bona fide purchaser because diligent investigation would have revealed that the interests were clearly subject to preferential rights. On appeal it urges us to conclude that the preferential rights provision is unenforceable due to the rule against perpetuities. Such equivocal positioning by a party unduly complicates complex litigation and creates unwarranted difficulties for other parties, their counsel, and the court.

If the court had sanctioned counsel, the absence of an express finding of bad faith would require that we set aside the award. *Knutson Mortgage Corp. v. Coleman*, 24 Kan. App. 2d 650, 654, 951 P.2d 548 (1997). Where the party itself is sanctioned, however, no such express finding of bad faith is required. See *Wilson*, 229 Kan. at 421. Sanctions pursuant to inherent powers must be exercised with restraint and caution and imposed only after proper notice and an opportunity for a hearing on the record. Here, the court's sanction award met these requirements and was reasonably necessary for the administration of orderly procedure in the discovery process and obedience to discovery rules. Under these circumstances, we are unable to conclude that no reasonable person would have taken the view adopted by the trial court.

We affirm the district court on the issues of standing and enforceability of the preferential rights provision. We reverse on the issue of bona fide purchaser and remand with instructions that the court determine whether there is any impediment to specific per-

formance of the preferential rights covenant. We affirm the sanc-tions award. We recognize that our mandate will likely result in ripening other claims of certain parties, and we remand for further proceedings not inconsistent with our mandate.

Affirmed in part, reversed in part, and remanded with instruc-tions.