(223 P.3d 815)
No. 100,780

In The Matter of the Marriage of SHANNON M. WILSON, *Appellee*, and BRUCE A. WILSON, *Appellant*.

Opinion filed January 29, 2010.

*Frederick K. Starrett* and *Matthew K. Corbin*, of Lathrop & Gage LLP, of Overland Park, for appellant.

*Robert S. Caldwell*, of Caldwell & Moll, L.C., of Overland Park, for appellee.

Before MCANANY, P.J., ELLIOTT and LEBEN, JJ.

LEBEN, J.: Bruce Wilson appeals two orders the district court made in Bruce's divorce from his wife, Shannon. First, he argues that the district court's child-support order went beyond the court's authority because $3,500 per month goes into a trust account that could be used by the parties' child after he reaches majority. We agree: Kansas law doesn't require a parent to provide support to a child after majority, and the district court's order effectively does so. Second, Bruce argues that the district court wrongly sanctioned him for his misleading and evasive responses during trial and in his required financial affidavit. We disagree: the district court has the inherent power to sanction a divorce litigant who provides misleading information in financial information that the law required to be disclosed as part of that divorce action.

I. *The District Court's Child-Support Order Is Beyond the Court's Authority Because It Provides Post-Majority Support.*

The district court ordered Bruce to pay $6,000 per month in child support for the benefit of the parties' only child, Finley, who was almost 5 years old when the case was tried. The district court ordered that Shannon place $3,500 of that amount each month into a trust fund for Finley's special needs or future education. The written journal entry setting out the judge's orders provided that Shannon place the $3,500 "into a trust account for the benefit of the Child or, if agreed by both parties, in the Child's existing 529 Educational Account." The journal entry also provided that child support would cease when Finley turned 18.

We review the district court's award of child support for abuse of discretion. *In re Marriage of Winsky*, 42 Kan. App. 2d 69, Syl. ¶ 4, 208 P.3d 355 (2009). The district court necessarily abuses its discretion when it makes a legal error, so we also review its orders for such errors. See *In re Marriage of Kunzle*, 2007 WL 3146683, at *4 (Kan. App. 2007) (unpublished opinion). When interpreting the applicable statutes and child-support guidelines, we do so independently, without any required deference to the district court. *In re Marriage of Brown*, 279 Kan. 282, 285, 109 P.3d 1212 (2005); *Winsky*, 42 Kan. App. 2d 69, Syl. ¶ 4.

Bruce contends that the district court exceeded its authority by requiring him to pay child support to be used after Finley reaches majority. The Kansas divorce statutes authorize an award of child support until the child reaches age 18 or, if still in high school, until June 30 of the school year in which the child turns 18. K.S.A. 60-1610(a)(1). No ·greater duty exists under the common law: a parent's common-law duty to support a child ends at majority. See *Arche v. United States of America*, 247 Kan. 276, 291, 798 P.2d 477 (1990); *In re Marriage of Risley*, 41 Kan. App. 2d 294, 299-300, 201 P.3d 770 (2009). Thus, absent a parent's written agreement, the parent cannot be ordered to provide support after the child reaches 18 and graduates from high school (though support may continue through June 30). See K.S.A. 60-1610(a)(1); Elrod & Buchele, 2 Kansas Family Law § 14.41(1) (1999).

Shannon suggests that the court's order was proper because the funds *could* be used before Finley reaches 18. That would indeed have been within the district court's authority. See *Ferguson v. Ferguson*, 6 Kan. App. 2d 287, 291, 628 P.2d 234 (1981). But that does not seem likely here given the lack of evidence of special educational needs at present, the amount of money being placed into trust, and most important the apparent intention of the district court. The district judge's oral ruling showed an intention that Bruce's $3,500-per-month contribution to the trust account could be used for educational expenses after Finley reaches 18: the court said that the $3,500 per month would be placed "into a trust for— a spend-thrift type trust for special needs or future education— special education, or *education past majority*." (Emphasis added.)

While the written journal entry doesn't specifically mention use of the trust fund for education past majority, it doesn't say anything that conflicts with that intention either. The district court's child-support award thus appears to have been based upon an intention that some of the money could be used for education after Finley turns 18, which is not allowed by court order (except for finishing high school). Thus, the district court's child-support award is based upon an error of law—that the district court could require that Bruce send money to Shannon to be put into an account to be used for education past majority.

Bruce asks us simply to strike the $3,500 amount, leaving Shannon with a child-support award of $2,500 per month. We cannot do so because we do not know that the district court considered $2,500 per month an adequate overall child-support award. The district court has authority to order some portion of the child support be used for a specific purpose, as took place in *Ferguson,* so long as it's not for use past majority. The district court did not state that *all* of the trust funds would be used after Finley turned 18; the court merely indicated an intention that *some* of the funds might be used that way.

We must respect the district court's role in establishing the proper amount of child support. That decision rests within the discretion of the district court, and an appellate court, which has not heard directly from any of the witnesses, should not make that discretionary call. We therefore reverse the district court's award of child support and remand the case for the district court to determine, from the date support was initially awarded, the proper amount.

II. *The District Court's $30,000 Sanction Against Bruce Was Within the Court's Authority in Light of Bruce's Attempt to Mislead the Court.*

The district court sanctioned Bruce $30,000—to be paid to Shannon—based upon Bruce's attempt to mislead the court about his income and assets. Bruce contends that he had no duty to update the court about a large increase in his income; that the court's sanction was excessive under constitutional double-jeopardy grounds since the court had already separately awarded one asset to Shannon based upon Bruce's failure to disclose information about it; and that any fault for failing to disclose the information was that of his attorney, not Bruce.

We review the district court's sanction orders for abuse of discretion. *Stone v. City of Kiowa,* 263 Kan. 502, 518, 950 P.2d 1305 (1997). Once again, since the district court necessarily abuses its discretion when it makes a legal error, we also review its orders for such errors. *Kunzle,* 2007 WL 3146683, at *4. To the extent that the district court's sanction order is based upon its factual findings,

we must accept those findings if substantial evidence supports them. See *In re Marriage of Wherrell*, 274 Kan. 984, 987, 58 P.3d 734 (2002). We first look then to determine whether the facts support the district court's conclusion that Bruce intentionally misled the court about his income and one specific asset.

If the district court's order is based on a valid finding that Bruce intentionally misled the court, we would then turn to the legal issues that Bruce has raised. As to legal matters, we must first determine whether the district court had the authority to sanction Bruce for the conduct at issue. If so, we must determine whether the sanction violated double-jeopardy rules, as Bruce claims. Our last review, if the district court's sanction order has passed those first two, will be for reasonableness: a district court abuses its discretion when no reasonable person would agree with its ruling. *Stone*, 263 Kan. at 518.

### A. *The District Court's Factual Finding that Bruce Intentionally Misled the Court Is Amply Supported in the Record.*

Based on Bruce's testimony throughout the trial, the district court found that Bruce tried to mislead the court about his current income and about the existence of one asset, the repayment of part of a loan Bruce had made to a friend. Since the entirety of his testimony is critical to our review, we have included all of the relevant portions as an appendix to this opinion. After reviewing Bruce's testimony, the district court concluded that Bruce and his attorney had "orchestrated such deception" and that Bruce's deception was thus intentional. Based on these findings, the district court sanctioned Bruce $30,000, to be paid to Shannon, "as a matter of equity and as a form of sanctions."

The trial began—and all testimony was presented—on January 8, 2008. Bruce had filed his first domestic relations affidavit in September 2007; it listed his gross income from self-employment as $294,448 per year. Less than a month before trial, in a pretrial questionnaire, Bruce continued to say that his average gross income from 2004 through 2006 had been $294,448. At trial, Bruce presented an amended domestic relations affidavit dated January 7, 2008; it listed his gross income as $472,500 but had an asterisk

leading to additional information: "All figures are based on 2006 income tax return."

After admission of the amended domestic relations affidavit, Bruce's attorney asked him some questions about his income. Bruce emphasized that his income could fluctuate from year to year and that he'd had some years in which he had no income. After explaining years in which he made little or no money, his attorney asked whether 2007 was an unusual year. Bruce, a commodities trader, said it was unusual because wheat had doubled in value. His attorney then moved on—without asking how much he made in 2007—to ask whether Bruce anticipated that conditions would stay the same in 2008. Bruce said he didn't know, then said his income for 2008 was down:

"Q: Do you anticipate that [the situation] would continue to be the case in 2008 as it was in 2007?

"A: I don't know.

"Q: Thus far this year, have you—is your income up or down?

"A: Down.

"Q: And have there been in fact significant losses?

"A: Yeah."

In sum, before cross-examination, Bruce had provided an updated domestic relations affidavit, dated January 7, 2008, that listed his income as $472,500 based solely on his 2006 income tax return. On direct examination, Bruce had said that his income varied from year to year, that it had been up in 2007, but that it was down thus far for 2008. Bruce never provided an estimate of his 2007 income, and only 5 trading days had passed in 2008 when Bruce testified that his 2008 income was "down."

On cross-examination, Shannon's attorney began with the straightforward question of what Bruce earned in 2007. Bruce replied that he hadn't done his "final books yet" but that he "definitely made as much in '07 as [he] made in '06." In response to additional questions, Bruce said that he didn't know what his taxable income would be for 2007 because he didn't know what his lawful deductions would be. He then admitted in response to further questions that he had "an idea" of what his 2007 gross income

was: $2 million. In a follow-up hearing held in February 2008, Bruce admitted that he had earned $2,169,134 in 2007.

Bruce's testimony about the loan and its repayment also began with reference to a document Bruce had provided; that document listed the parties' assets and liabilities. Bruce's attorney asked him whether the document was accurate, and Bruce said that it wasn't—the document omitted a $37,500 personal loan Bruce had made to a friend in Chicago to start a business. In response to questions from his attorney, Bruce requested that whatever might be repaid on that loan be assigned to him—though he didn't expect to receive anything:

"Q: It is your request that [the loan] would be set aside to you, is that correct, should you receive any repayments?

"A: Yes.

. . .

"Q: And is it your expectation that you would receive that—these monies back?

"A: No."

On cross-examination, though, Bruce admitted that he'd already received $19,000 in two repayments on the loan. Bruce had received one in the mail on January 1 or 2, and he'd received the other the day before trial. The court later determined that Bruce had received $19,820 in loan repayments.

It's readily apparent that Bruce tried to deceive the court about the $19,820 he'd already received on the loan to his Chicago friend. Bruce hadn't included the loan on his list of assets, and he corrected that list in testimony that his attorney elicited only to include the loan, not the repayments. Moreover, he said that he had no expectation that he would receive any repayment even though he'd been repaid more than half of the principal amount of the loan during the 7 days before he testified. Bruce's counterargument that he didn't deceive anyone because he admitted to the repayments on cross-examination does not change the analysis—the information Bruce provided to the court about the loan on direct examination was false: though he denied expectation of repayment, he'd already been repaid $19,820. His testimony was also misleading: he asked that any repayments that might be made be assigned to him while indicating that the likely value of that assignment was

negligible. Given the timing of the repayments and Bruce's admission about them on cross-examination, the district court fairly concluded that Bruce's misrepresentations about the loan were intentional.

Bruce makes a more plausible argument that he didn't deceive anyone regarding his income. The footnote to his domestic relations affidavit clearly said that the income figure he reported there was based solely on his 2006 tax return. As Bruce notes, the district court, citing that footnote, said in its initial oral ruling that the affidavit wasn't false and that "there was no false testimony." But the court also said orally that Bruce "was trying to hide [his 2007 income] hoping that he would not have to disclose the information." The court further concluded in its final written order—entered after the court had ordered a transcript of Bruce's testimony—that Bruce "was intentionally misleading" about his income and that he had "attempted to mislead the court" about it. The court's written order found that Bruce had failed to disclose his 2007 income and that in doing so Bruce had intentionally attempted to mislead the court.

In other contexts, the law recognizes that a person may mislead another by omission. Since 1934, federal securities laws have made it a crime, in connection with the sale of a security, to omit any material fact that's necessary to make the statements that are made not misleading. See 15 U.S.C. § 78j (2006); 17 C.F.R. § 240.10b-5 (2009). Kansas has similar provisions providing criminal penalties for material omissions in the sale of securities and in transactions by loan brokers. See *State v. Bryant*, 40 Kan. App. 2d 308, 312-13, 191 P.3d 350 (2008), *rev. denied* 288 Kan. 833 (2009); *State v. Fritz*, 261 Kan. 294, 304, 933 P.2d 126 (1997).

The district court found that Bruce had misled the court in just this way. Bruce voluntarily disclosed his $472,500 in income for 2006, but his failure to disclose his $2.17 million income for 2007 made Bruce's disclosures misleading when the issue before the district court was the determination of Bruce's current earnings and future earning potential. See K.S.A. 60-1610(b)(1). We agree with the district court that Bruce misled the court about his in-

come, and the district court's conclusion that Bruce did so intentionally was a fair one based upon the evidence.

We recognize that a claim of civil fraud by silence requires more than mere omission of a material fact. That civil claim also requires proof that the other party couldn't have discovered the omitted fact with reasonable diligence, among other elements. See *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman*, 267 Kan. 245, 260, 978 P.2d 922 (1999). Here, Shannon discovered Bruce's 2007 income by having her attorney ask him questions on cross-examination, so the information was obtained through reasonable diligence. But the district court did not find that Bruce had committed civil fraud by silence; it found that Bruce had intentionally misled the court, a conclusion fairly made based on the evidence. We consider in the next section whether that conclusion is sufficient as a basis for sanctions.

B. *The District Court Has Authority to Sanction a Party in a Divorce Action Who Intentionally Misleads the Court Regarding Income or Assets.*

The district court did not cite any specific statute or court rule as a basis for its sanction against Bruce. But no specific statute or court rule need be violated for the district court to enter sanctions against a party: the court has the inherent authority to enter sanctions reasonably necessary for the administration of justice so long as those sanctions aren't inconsistent with relevant statutes. *Wilson v. American Fidelity Ins. Co.*, 229 Kan. 416, 421, 625 P.2d 1117 (1981); *Larson Operating Co. v. Petroleum, Inc.*, 32 Kan. App. 2d 460, 471-72, 84 P.3d 626 (2004).

Sanctions have been upheld in other cases for inaccurate or evasive discovery responses. In *Larson Operating Co.*, our court upheld sanctions against a party for its initial discovery response, which the district court found could have been more accurate "with minimal diligence." 32 Kan. App. 2d at 464, 472. More recently, in *Comprehensive Health of Planned Parenthood v. Kline*, 287 Kan. 372, 420-23, 197 P.3d 370 (2008), our Supreme Court sanctioned an attorney in part for evasive and incomplete answers to written questions, along with other violations.

The context in which Bruce's attempt to mislead the court occurred—a divorce case—is worth noting. About 14,000 divorce cases are filed each year in Kansas, and the judges who handle these cases have a duty to divide property and, when appropriate, award maintenance in a just and equitable manner. See K.S.A. 60-1610(b)(1), (2); *Nicholas v. Nicholas*, 277 Kan. 171, 178, 83 P.3d 214 (2004). To accomplish that, Kansas court rules require that each party in a divorce case file a domestic relations affidavit. Supreme Court Rule 164(a) (2009 Kan. Ct. R. Annot. 238). The rules provide a specific form for the affidavit, which must include information about income and assets, with the information sworn by each party to be "true and complete." See Rule 164(a) (requiring affidavit be in form found in appendix to Kansas Child Support Guidelines); Kansas Child Support Guidelines, Appendix III (2009 Kan. Ct. R. Annot. 152-57). Our court has previously emphasized the importance of this affidavit: without it or comparable information, the district court may not approve a divorce settlement agreement because the court would lack the information needed to determine whether that settlement was just and equitable. *In re Marriage of Kirk*, 24 Kan. App. 2d 31, 33-34, 941 P.2d 385, *rev. denied* 262 Kan. 961 (1997).

So Bruce was required to disclose his income to the court, and that information was critical to the court's ability to do its job of providing a fair resolution of the issues before it. When a party is required to disclose information to the court, that party cannot omit material facts that are necessary to avoid misleading the court about what has otherwise been disclosed by that party. The district court had inherent authority to enter sanctions in this circumstance.

We reject Bruce's argument that because this is litigation he may present a wholly one-sided set of facts and decline to provide other information until someone asks for it. Court rules required that Bruce disclose income and assets, and when the rules require disclosure, an intentionally misleading disclosure does not suffice.

C. *The District Court's Sanction in this Case Did Not Violate Double-Jeopardy Rules.*

Bruce objects that the district court sanctioned him twice for the same conduct. He asserts that this violates the constitutional prohibition against double jeopardy.

The district court did arguably enter a sanction in addition to the $30,000 award: the court awarded Shannon the full $19,820 that had been repaid against the loan. Had that loan repayment been treated like most of the parties' other property, the amount would have been equally divided between them. The court did equally divide any future repayments that might be received against that loan.

Under Bruce's argument, the district court's $30,000 sanction was based both on the failure to disclose the loan repayments and the attempt to deceive the court about Bruce's income. Thus, since the court already sanctioned Bruce by disproportionately awarding Bruce's share of the $19,820 to Shannon, the court entered two sanctions against Bruce for the same conduct.

But in order for double-jeopardy protection to apply, the punishments must be criminal. *Hudson v. United States*, 522 U.S. 93, 98-99, 139 L. Ed. 2d 450, 118 S. Ct. 488 (1997); see *State v. Harris*, 284 Kan. 560, 571, 162 P.3d 28 (2007) (double-jeopardy provision in Kansas Constitution provides same protection as provided under United States Constitution). In determining whether a sanction is criminal in nature, courts consider whether it involves some affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of knowing conduct, whether it promotes the traditional punishment objectives of retribution and deterrence, whether the behavior is itself criminal, whether there's an alternative noncriminal purpose to the sanction, and whether it appears excessive in relation to that alternative purpose. 522 U.S. at 99-100.

Under these factors, Bruce has not demonstrated that the sanction against him rises to the level of criminal punishment. Although a court arguably imposes a monetary sanction to punish a party for his actions and to deter him from similar future conduct, the court

didn't restrain Bruce's freedom of movement. Under Kansas law, bad faith is not required before a court may sanction a party for litigation misconduct. *Larson Operating Co.*, 32 Kan. App. 2d 460, Syl. ¶ 9. Moreover, the district court itself noted an alternative purpose for the sanction—making sure that the case was resolved in an equitable manner and reimbursing Shannon for some of her attorney's fees.

We note that the district court decided to have the parties present some additional information, based on rulings made at the end of the initial day of trial, before the court made a final decision. Thus, a second hearing was held about a month later. At that hearing, Bruce revealed his actual 2007 income. Had that income been revealed in Bruce's amended domestic relations affidavit, perhaps the issues could have been fully resolved on a single trial date, and Shannon would not have incurred attorney's fees for a second hearing.

We say perhaps because we do not know the full argument Shannon made in support of a request for attorney's fees and sanctions; her written motion, listed in the docket entries as a motion for attorney's fees and sanctions, is not included in the appellate record. We do know that the district court noted in its oral ruling that Shannon could "use part of that [$30,000] to pay her attorney's fees."

An appellant has a duty to provide a record sufficient to establish the claimed error; without a sufficient record, the claim fails. *City of Mission Hills v. Sexton*, 284 Kan. 414, Syl. ¶ 16, 160 P.3d 812 (2007). Based on the appellate record, Bruce has not demonstrated that the sanction was in the nature of a criminal penalty. See *Mine Workers v. Bagwell*, 512 U.S. 821, 833, 129 L. Ed. 2d 642, 114 S. Ct. 2552 (1994) (judicial sanctions such as striking pleadings, assessing costs, and even entering default judgment to penalize a party's failure to comply with conduct rules in litigation have "never been considered criminal"). Accordingly, we find no double-jeopardy violation.

D. *The District Court Did Not Abuse Its Discretion in Its Sanction Order.*

We must take two legal standards into account in considering whether the district court abused its discretion in entering the $30,000 sanction award against Bruce. First, a district court abuses its discretion only when no reasonable person would agree with the district court's decision. *Larson Operating Co.*, 32 Kan. App. 2d at 471. Second, when a court exercises its inherent power to sanction a party, the court should act with restraint and only after proper notice and an opportunity for a hearing. 32 Kan. App. 2d at 472. Thus, we consider whether the district court abused its discretion mindful of the restrained approach that a district court should take when considering sanctions.

Notice and a hearing were provided. Shannon's motion for sanctions gave Bruce notice of the issue, and the court provided a hearing on the motion. Bruce's attorney indicated at the start of that hearing that Bruce wanted all issues heard and resolved that day, even though he hadn't filed a written response to the sanctions motion.

As to the reasonableness of the $30,000 sanction, Bruce had income in excess of $2 million in 2007; though that was atypical, he had earnings above $200,000 in all but 1 year from 2002 through 2007. The parties had overall assets of about $1.7 million, which were generally divided equally between them. In the context of Bruce's income and assets, the sanction was within reasonable bounds for the conduct. The district court did not abuse its discretion.

Bruce also argues that it was an abuse of discretion to sanction him because his attorney was responsible for the sanctioned conduct. But that's not a defense here. Whether the attorney knew that the information was false or misleading is not the issue before us on appeal. Under Kansas law, a party to litigation may be sanctioned for things like discovery abuse even without bad faith. *Larson Operating Co.*, 32 Kan. App. 2d 460, Syl. ¶ 9. Here, though, the district court found that Bruce was intentionally deceptive, and the evidence supported that conclusion. Bruce answered falsely

regarding the loan-repayment issue, and he attempted to dodge multiple questions before finally admitting that he had "an idea" of what his 2007 income had been. This is not a case like *Canaan v. Bartee*, 272 Kan. 720, 737-38, 35 P.3d 841 (2001), which Bruce cites, where the most severe sanction available—default judgment—was set aside because the discovery failure was the sole fault of the attorney and the clients had no apparent knowledge of the attorney's actions.

The judgment of the district court is reversed with respect to its order of child support and is affirmed in all other respects. The case is remanded to the district court to enter a child-support award in a manner consistent with this opinion.

### APPENDIX

Direct Examination

Q. Mr. Wilson, I'm going to show you what has previously been marked and entered into evidence as Exhibit 50. Is this your statement of assets and liabilities?

A. Yes.

Q. And does that document accurately and completely reflect all of the assets as of the time of the filing of this action?

A. No.

Q. Is there one item that was failed to be included in that document?

A. Yes.

Q. And can you tell the Court what that is?

A. It was a personal loan that I made to a friend in Chicago to start a business.

Q. And approximately when was that money loaned to your friend?

A. January 2006.

Q. Was your wife aware that the loan had been made?

A. I believe so.

Q. And have you—has your friend's business been successful?

A. No.

Q. And in fact, has he lost the majority of those monies?

A. Yes.

Q. You—was it—tell the Court why that asset was not reflected on this statement, or that liability.

A. When Shannon and I were talking about splitting up, we had—I had asked if that would be something that I could have, and under the assumption that it just be you know, just something that extra, you know, for me, I guess, and that I would—that I originally I believe on one of the DRA's I submitted very early in the process, it was on there as an asset. The last one when we met in [Shannon's

attorney's] office, we had not—we just did not talk about it. So, it was somewhat of an oversight then.

Q. It is your request that that would be set aside to you, is that correct, should you receive any repayments?

A. Yes.

Q. That was simply—

THE COURT: How much was it?

Q. . . . How much was the original loan?

A. 37,500.

Q. And is it your expectation that you would receive that—those monies back?

A. No.

Q. And again, that was an item that had been discussed earlier. We just failed to reflect it on this most recent statement; is that correct?

A. Correct. Correct.

Q. Simply an oversight. Let's talk a little bit about your employment. What is your line of work?

A. I'm a commodities trader.

. . . .

Q. Going to show you what's been marked as Exhibit 51, and is this your domestic relations affidavit which corresponds to the assets and liabilities which were reflected in Exhibit 50 as well as your income and your expenses?

A. Yes.

. . . .

Q. Now, in your work as a commodities broker, has there been a great difference in your income from year to year?

A. Yes.

Q. Can you explain to the Court why your income would change from year to year?

A. You know, the biggest reasons are having, you know, the years that I've made a good living, I've had the right positions on and were able to, you know, buy and sell wheat and wheat options at a profit, and the years that I've not made money or less money, I've had bad positions on, and not been able to maximize gains and not been able to cut losses fast enough.

Q. Now, I'm going to show you what's been marked as Exhibit 54, and can you identify this document for the Court?

A. It's a social security statement that I receive on a yearly basis.

Q. And does it reflect your Medicare wages from 1983 through and including 2006?

A. Yes.

. . . .

Q. If you would turn your attention to the second page of this document. Have there been years recently where you earned no income whatsoever as a commodities broker?

A. Yes.

Q. And what years?

A. 1998 to 2001.

Q. Now, the last then for two years you made a pretty significant income; is that correct?

A. Correct.

Q. Then what happened in 2004?

A. I lost a significant amount of money in a two-week period, and spent the rest of the year trying to recoup my losses, and this adds up to that number.

Q. Is that fairly common in your area of your field?

A. It can be.

Q. Now, was 2007 an unusual year?

A. Yes.

Q. In what way?

A. Price of wheat more than doubled in value.

Q. And why was that?

A. Well, a lot of reasons. One reason would be the advent, I guess, of a lot of exchange commodity index funds which are trying to hedge against inflation. So, they end up having a formula that says we think that these eight commodities bought in the correct percentages will make us a return of whatever, X percent, you know, versus, you know, what would happen. Maybe the stock market broke down. So it was a way for people basically to investment in big commodity pools. They throw around enormous size orders in all the—all the commodity pits that they trade in gas, oil, Kansas City wheat, which you know, dramatically moves the market. It also means that other funds that are trading on a trend-following basis get signals to either buy or sell wheat futures at certain times. So you've got a big influx of capital, and big-time capital, not a million dollars, 500 million dollars; billions of dollars. On top of that you had a situation in last couple of years where the crops have actually—the crop size or harvest has actually been less. So you've got kind of a little bit of a perfect storm. In this case where you have a LOW supply, you've got fund money pushing markets higher, and because of the lower supply, you're getting increased demands, and the prices have, you know, obviously gone up, and gone up quite a bit.

Q. Do you anticipate that that would continue to be the case in 2008 as it was in 2007?

A. I don't know.

Q. Thus far this year, have you—is your income up or down?

A. Down.

Q. And have there been in fact significant losses?

A. Yeah.

Q. What—

THE COURT: Are you talking about 2008?

[Bruce's attorney]: I am.

THE COURT: Which is, I don't know; how many trading days have been in 2008?

THE WITNESS:   Five.

THE COURT:   Go ahead. I want[ed] to make sure that's what we're talking about.

. . . .

### Cross-Examination

Q.   The loan that was provided to your friend for $37,500, you haven't received any payment back on that, have you?

A.   I have.

Q.   How much have you received?

A.   $19,000.

Q.   And when did you receive that?

A.   I received—I received one check yesterday, and I received another check like the—when I got back in town from vacation after January 1st or 2nd when I picked up my mail.

Q.   I thought you just indicated this was a debt you didn't anticipate getting paid back on?

A.   I didn't anticipate getting paid back on it.

Q.   As we sit here today, you got $19,000 in your pocket toward this debt?

A.   Yes.

Q.   And your position is you want it all set aside for you?

A.   I would ask the Court for that, yes.

Q.   You don't think that should rightfully be divided with Mrs. Wilson?

A.   I have no objections if it is divided with Mrs. Wilson. The 19—the 19,000 and change.

Q.   Is that—other than this $19,000, [are] there any other accounts or monies being held by somebody for you?

A.   No.

Q.   Everything that you're aware of that you own that's an asset of yours is contained on that spreadsheet, and then this $19,000, correct?

A.   In addition to the 19—yes.

Q.   I just don't want to be surprised there's something else out there.

A.   There's not.

Q.   In '07, what I believe I heard was it was a banner year?

A.   For some people.

Q.   Okay. How about you? What did you earn in '07? We've been basing this on '06 tax returns. I wonder what you earned in '07?

A.   I haven't done my final books yet. I would say I definitely made as much in '07 as I made in '06.

Q.   Now, we agreed that we would get this divorce before the end of the year to help you on your tax situation. Would you agree with that?

A.   Yeah.

Q.   Okay. Do you have some idea what the tax savings were?

A.   No.

Q. Okay. Did your accountant give you some general idea of how much you made this year?

A. No.

Q. Would it be—I'm assuming you made, say, over $500,000 in '07. You would know that, compared to '06?

A. Yes.

Q. And you have some idea?

A. I have some idea.

Q. Give me that some idea. I want to make sure we're being fair here.

A. Well, I—I mean, are you asking for my taxable income?

Q. Yeah.

A. I have no idea, because I don't know what I can write off against.

Q. Do you know what your gross—I'm sorry. I didn't mean to interrupt. Do you know what your gross is?

A. I have an idea.

Q. What's that?

A. About two million dollars.

Q. Okay let's go look at your '06, if I could get that real quick, '06 tax return. Thank you. Maybe you can help me, but if I look at Exhibit Five, maybe I'm wrong; was your gross in '06 $472,498?

A. Yes.

Q. And so, now it's at two million in '07.

A. Yeah.

Q. When do you anticipate having your tax returns done?

A. I don't know. I mean, obviously I'll have to file something by April 15th, but I—

Q. Your estimated?

A. Yeah.